The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good morning. The first case for argument this morning is 192096 Arlanxeo USA v. United States. Mr. Soberg, ready to hear from you. Good morning. May it please the Court. Will Soberg on behalf of Negromex and INSA. With regard to my first issue, price effects and underselling, at the administrative stage the Commission found significant and widespread underselling, while not considering certain domestic industry prices as according to the Commission, inclusion of those prices would not have significantly affected the underselling calculations. However, before the Court of Appeals, the Commission took a contrary position. Excuse me. The Commission first introduced East-West pricing behavior from the preliminary investigation in its CIT response brief as an affirmative defense to counter Negromex's argument in the impact section of its brief that Lion's pricing behavior was a cause of the domestic industry's ills. East-West pricing behavior covers 77% of the final period of investigation. Mr. Soberg, it's correct, is it not, that you didn't raise this issue about the East-West pricing data before the ITC, nor did you raise it in the CIT before oral argument. Am I correct about that? No, sir. You are correct that we did not raise it at the administrative stage. However, in Section 131 of the Commission's views, the Commission specifically says no inference can be made that the inclusion of certain domestic industry prices would have affected their underselling analysis. As before the CIT, the Commission introduced the East-West pricing behavior. We responded to it in our response brief and at oral argument. This is Judge Prost. Is that really the way it's supposed to work here? I mean, I have a little bit of reservation. Just be clear to me, because there were some confidential redactions. So you've mentioned East-West pricing, so I assume that's not confidential material, that at least the reference to that statement is not confidential. Is that correct? Well, in footnote 131, the Commission refers to certain domestic industry pricing information was not included. However, in footnote 9 of the staff report, it says that East-West did not submit a questionnaire response. And I'm not quite certain how that responds to Judge Dyke's concerns or questions about the waiver. Was it a yes to his question about whether the first time you raised this was at oral argument before the CIT? No, Your Honor. The first time I raised it was in our reply brief to the Commission's response when they introduced it. Okay, but why isn't it a waiver because you didn't raise it before then? Well, according to this court, if an appellee raises an issue, a material issue, in their response brief, appellant in fundamental fairness dictates that the appellant is allowed to reply. Well, let's assume for the moment that that excused your not raising it earlier before the CIT. But the whole purpose of the exhaustion doctrine is that you raise the issue before the agency so that the agency has a chance to address it. But here you did not raise it before the agency, right? That is correct, Your Honor. We did not. And the agency actually affirmatively discounted it, said that it did not matter. However, before the CIT, they decided it did matter. Well, where did they address this East-West data in the decision? Is that in footnote 132? It's in footnote 131, Your Honor. Footnote 131? Of the commission's views. That's correct. Yes, but they basically say in any event, respondents do not argue that prices were so much lower than the other domestic producers' prices that inclusion of its pricing data would have significantly affected the underselling calculation. Exactly. They said that it wouldn't, and I show in my brief that it did, and it would. Well, your brief in the here. You're not talking about your brief before the ITC, right? The CIT, Your Honor. We spoke about it in our response brief, and we also spoke about it at oral argument. But you did not speak about it before the ITC? Before the ITC, we did not, no, Your Honor. Okay, why don't you continue with your argument, sir? Thank you. Well, East-West pricing behavior covers 77% of the final period of investigation, while the only inference that can be made to the remaining 23% is that East-West continued its pricing behavior because East-West was still in business. Including East-West pricing behavior in the commission's underselling analysis changes the results, such that the commission's underselling analysis was unsupported by substantial evidence. The commission's because the commission offered an explanation that ran counter to the evidence before the agency, evidence that was introduced by the commission at the CIT. With regard to price effects and price depression suppression, prices of the domestic-like product ended the period of investigation higher than they started, regardless of whether East-West pricing behavior is included. To avoid that fact, the commission truncated the last quarter of the final period of investigation from its analysis. The commission's basis for so doing consisted of one sentence and a footnote characterizing conditions during that period as anomalous because the cost of raw materials spiked. That's footnote 132 of the commission's views. Such analysis is hardly fulsome, given that the commission's entire price depression argument depended upon it. As such, that part of the commission's analysis was not in accordance with law. In its brief before this court, the commission amended its rationale to also include that the increase in price of the domestic-like product allegedly masked price depression, which begs the question of whether the commission now also considers increased prices an anomaly. The only way that monthly contract prices increase after the contracts are signed is if the price of butadiene and styrene increase during the year. The importance of raw materials in ESBR contract prices cannot be understated. The commission recognized such when it truncated the period of investigation for purposes of its price depression analysis. But, you know, sir, I appreciate the arguments you're making and the ones you've made in your brief, and they're numerous, but we're under substantial evidence review here, and this is complicated stuff, and there's an enormous amount of material here to be analyzed, and it's a little difficult for us here at the appellate level to reevaluate everything that the commission did with respect to the importance and the weighing of the various factors. So I assume you appreciate that. I do, and with respect, I'm trying to make it as clear as I possibly can. Well, clarity is not the issue. The problem is, the difficulty is that there's a lot of evidence in the record. The commission considered it. We assume they considered all of it. They analyzed it in maybe in not enough detail to your liking, but they did analyze all the factors and weigh all the factors, and it just seems to me that it's difficult here at the appellate level under substantial evidence review to start second-guessing them and reevaluating the entire record. I understand, Your Honor. Shall I continue? Sure, please. I'm sorry. Yes, please continue. ESBR prices rise and fall on the objective published price of raw materials. That ESBR prices increased when the price of raw materials increased in the last quarter of the period of investigation is a testament to that fact. It's hardly a surprise and certainly not anomalous. On one hand, the commission truncated the final period of investigation because the price of raw materials drive ESBR prices. On the other hand, the commission found price depression in the truncated period because the convergency component drives ESBR prices, and cuts in that component allegedly depress the price of the domestic-like product and affected profitability. Those two positions cannot be reconciled, particularly when you consider the movements in the ratio of the cost of raw materials to total net sales. I referred the court to Table 6-1 on Appendix Page 1594 and urged the court to compare the change in that ratio between the first quarter of 2016 and the first quarter of 2017, which includes the commission's anomalous period. With the changes in the same ratio between 2014 and 2015, and 2015 and 2016, if the former change was anomalous, there could be no question that the latter two changes were likewise anomalous. If there's still a question of whether the price of subject imports caused the price of the domestic-like product to decrease in the truncated period advocated by the commission, the decrease in the cost of raw materials exactly equaled the decrease in the price of the domestic-like product. Other than truncating the period of investigation, the commission's price depression argument boils down to some weekly reports issued by Lion throughout the year that stated that the prices of subject imports were lower than Lion's prices. In its brief, the commission extrapolated those reports to contract negotiations with purchasers, none of which identified subject imports as the source of the low prices. The commission in Lion would have this court believe that customers leveraged the domestic producers into lowering contract prices based on subject imports' lower contract prices. That's impossible. Monthly contract prices are not known until immediately prior to or during the month of shipment and are entirely dependent upon changes in the published monthly prices of butadiene and styrene. The conversion fee component is fixed for the life of the contract. Lion's weekly reports must pertain to the spot and not the contract market. Spot market prices were never at issue during the investigation. We'll hear today that low-priced subject imports forced the domestic industry to lower its contract conversion fee, thereby affecting industry profitability. But what's the source of those low prices? It can't be ESPR spot reports because those weekly reports only report prices for a week, not for the following year. It can't be the future monthly contract prices of ESPR because those prices are unknown during negotiations. There's simply no objective support in the record for ESPR purchasers and importers using only contract conversion fee component of subject imports and not that of the domestic-like product as leveraged in contract negotiations. The Commission and Lion's position that the price depression analysis must focus only on the fixed conversion fee component, presumably because that component affects profitability, is belied by Lion's own contract formula. See page 41 of our confidential brief. Given that prices ended the POI higher than they started or tracked exactly the fluctuations in the price of raw materials in the truncated POI, it's unreasonable that low-priced subject imports depressed the price of the domestic-like product. As such, the Commission's price depression analysis is unsupported by substantial evidence. With regard to impact, although the domestic industry was in a poor condition, subject imports were not the cause of such condition. The Commission's impact analysis was predicated on its underselling price depression analysis, including that subject imports were allegedly the cause of the domestic industry's poor condition. However, the Commission's underselling and price depression analysis employed an erroneous methodology. In other words, the Commission's impact analysis was based on a faulty premise. Except for within our brief, Lion and EastWest were the cause of the domestic industry's poor condition, not subject imports. EastWest filed for bankruptcy at the end of the period of investigation. After imposing its pricing behavior on the U.S. market for no less than 77% of the period of investigation, and we can only infer that EastWest continued such behavior for the remaining 23% of the period. Lion suffered from an admitted cost-price squeeze due to the high relative increases in its cost of raw materials, a circumstance that the Commission failed to address. Lion also self-inflicted injury by applying damaging pricing behavior related to sales for which there was little or no competition from subject imports. Thank you, and I will save whatever time I have left for rebuttal and conclusions. All right. Thank you, sir. Ms. Dempsey? Thank you. May it please the Court, as the Court of International Trade properly found, the Commission's findings on price and impact, the only two issues that NEGRMAX has challenged in this appeal, is supported by substantial evidence and is otherwise in accordance with law. Ms. Dempsey, can I ask you... I'm sorry, this is Judge Prowse. Can I just interrupt you and ask you about one point that your friend raised in his pre-fitted argument? And you cite NUCCOR saying that for the proposition that the Commission has the discretion of picking the time periods here, but that case also emphasized the importance of including the most recent time period. And so what's the... Why is the Commission's decision to exclude the first quarter of 2017 which is the most relevant recent time period appropriate? Well, as the Commission found, anomalous conditions existed during the first quarter of 2017 that directly impacted domestic prices. And because the Commission's... High material costs? It was an anomalous spike in raw material costs. So what was happening with raw material costs? They were fluctuating and were declining. But in the first quarter of 2017, you see a dramatic spike. And given that the published prices of raw materials were directly tied to the variable component of the domestic industry's contract pricing formulas, this anomalous spike was directly responsible for the sharp spike in domestic prices. And given this anomalous condition, the Commission was reasonable in focusing its analysis on a time period 2014 through 2016 when prices were in fact declining and otherwise were not impacted by this anomalous spike in raw material costs. But the 2017 data is not just for the domestic producers, right? It's comparative data between the domestic producers and the importers, no? Yes. So that's for... It's comparative data with respect to underselling. But for price trends, which is what the Commission uses in analyzing price depression, we want to look at whether anomalous conditions exist in the first instance that are impacting domestic prices before the Commission even continues its analysis in determining whether subject imports were significantly depressing domestic prices. The Commission was entirely reasonable in focusing its price depression analysis within this time period. So wasn't the argument that the 2017 data should not only be used for price trends, but also for determining comparative price levels? That's correct. And the Commission did use first quarter 2017 data in its underselling analysis. It didn't use it for its price depression analysis. Moving back to price underselling, Nargimax insists that it did not waive this argument that the Commission should have included East-West pricing data that it submitted. Well, let's stay with... Ms. Dempsey, why don't we stay with the 2017 exclusion of that first quarter? Sure. It's true, is it not, that the only analysis that we have of the Board in analyzing this matter, which seems like a pretty big deal, is the one footnote in its opinion at footnote 132, correct? That's correct. And what did they say here? So this is all relegated to a footnote, and what they say is there are now anomalous conditions during this quarter, and then they cite to, what's this document they're citing to? It's the staff report. Okay. Yeah, so the staff report set out a table that showed the raw material costs and how they were fluctuating and declining, and then you see a huge spike in raw material costs, and it sets forth the percentile increase. And that percentile increase is business proprietary information, but it was significant and it was anomalous. But I'd also like to point out here that raw material costs only impacted the domestic industry's variable component and did not have anything to do with the domestic industry's fixed fee component, which covered the domestic industry's profits and other costs. And so while domestic prices may be impacted by raw material costs, this fails to explain the substantial cuts that were made to the fixed fee component of the domestic industry's contract pricing formulas. And as the record demonstrated, there was substantial evidence from purchasers informing the domestic industry of the low-priced subject imports, that its prices were too high compared to subject imports, and requesting it to meet these lower subject import prices. Okay, but where do we find the use of the 2017 data in the underselling analysis? Because if I understand correctly, you're saying that the rejection of the first quarter of 2017 data was only in connection with the price trends analysis. And I can understand the argument that if those prices were distorted by high material costs, that might not be relevant. But where do they use the 2017 data for underselling? So the underselling analysis is on pages 31 and through 33 of the commission's final views. I'm sorry, do you have an appendix cite for that? Sure, I apologize. Appendix number 1719 to 1721. And here, the commission explains how subject imports undersold the domestic-like product in 150 of 218 quarterly price comparisons, involving 85 percent of the quantity of subject imports. How do I know that includes the 2017 data? Because of the quarterly 200. It's cited to the staff report, which includes If you look at table 510 of the staff report. What page? It is, sorry, appendix number 1583. You'll see that this table is entitled instances of underselling, overselling, January 2014 through March of 2017. And there's underselling in 150 out of 218 quarterly comparisons. So in addition to these purchaser communications that were on the record, exerting this pricing pressure on the domestic industry to reduce the fixed fee component of the contract pricing formulas, the record also demonstrated that during the contract negotiation process, that purchasers would negotiate this fixed fee. And although Niagara-Mex argues that it was impossible for purchasers to negotiate a fixed fee because contracts were negotiated and signed a month prior to them taking into effect, and that different suppliers used different pricing formulas to different published prices of raw materials, these arguments are actually directly contradicted by the statements that respondents, including Niagara-Mex, made to the commission during the administrative proceedings below. Could we move to the fair to consider the East-West data, which put aside the waiver question, which we've covered at some length, but assume there wasn't a waiver, why isn't that pertinent data? Well, because as the commission explained, the data that the commission actually collected from domestic producers and U.S. importers in the final phase of the investigation were representative. Specifically, they collected data from Lion and Goodyear, which not only accounted for the majority of domestic production, but also accounted for the majority of shipments made during the period of investigation. Okay, but I don't find that particularly convincing. When you have data for a third entity, which is a major player in the domestic market, it seems to me that you risk data manipulation by excluding it. Respectfully, we disagree because, first of all, there is no statutory basis for the commission to aggregate preliminary phase data with final phase data, nor did Niagara-Mex cite to any prior... It's the same data, right? It's not the same data. It's not because the final phase spanned a different time period and also collected data on different pricing products. Niagara-Mex itself, when it attempts to aggregate... It included data for East-West for ten quarters out of the 13 that were considered, right? Right, but also didn't collect data from East-West with respect to the last three quarters of the final period of investigation, which is, as Chief Judge Post pointed out, the most recent time period. Moreover, there was a pricing product that was included in the final phase of the investigation, Pricing Product 4, that was not included in the preliminary phase. And so, in trying to aggregate the data itself in its opening brief, Niagara-Mex ignores a large amount of pricing data that was on the record of the final phase of the investigation. And here, where the data collected was representative of the domestic industry, accounting for the majority of shipments of the domestic-like product, the commission was entirely reasonable in finding the data to be representative. Wow. Moving to impact... I'm skeptical about that. But even if one were to accept Niagara-Mex's argument and consider East-West data, the more reasonable analysis is to do what the commission did in the final views, which is to point to its preliminary phase underselling analysis. And in that phase, in the preliminary phase where the commission actually considered East-West pricing data within the context of the appropriate period of investigation and appropriate collection of pricing products, the commission found that subject imports still significantly undersold the domestic-like product in 70 out of 127 quarterly comparisons. Moving to impact, the commission found that due to the availability of low-priced subject imports, the domestic industry was forced to reduce prices, which caused its revenues to be lower than they otherwise have been. The domestic industry performance was poor throughout the period of investigation, with Based on the totality of the evidence, the commission reasonably concluded that subject imports had a significant adverse impact on the domestic industry. In conclusion, we respectfully request that this court uphold the Court of International Trade's decision sustaining the commission's final affirmative material injury determination. Thank you. Perfect timing. Mr. McGrath? Good morning. You've got two minutes in the morning. Your Honors, may it please the Court, I'm Matthew McGrath, arguing for Defendant Appellee Lyon-Elastomers, which was also the petitioner in the underlying investigation. We're in agreement with all of the government's arguments, and I just wanted to make a couple of quick points. First, the appellant's understanding of statutory requirements to make two separate inquiries is not quite clear. Underselling and price depression are two separate inquiries. The commission did just that, as two separate inquiries. For the underselling analysis, although EastWest did not submit a questionnaire response, the commission's final decision did comment on that company's prices, as Ms. Dempsey just pointed out, as reported during the preliminary investigation, observing the same trends for the industry, considerable resulting underselling when looked at as a whole. With respect for price depression and suppression, the commission has broad discretion to decide which data they deem most appropriate. In this case, we agree the anomalous conditions were an extremely high spike, unusual spike in raw material costs, which had an impact on everybody's prices. Nonetheless, selected data used by the commission were representative of the domestic industry as a whole, as required by the statute. They're not required to look at individual company impacts. With respect to contract pricing, the commission identified that that pricing is partially tied to the cost department. In order to determine whether data are representative, don't you have to compare the data other than the data that you've chosen to use so that you can make a conclusion that the other data that you're discarding, it wouldn't be representative, would it? Well, Your Honor, that's why this is important that they did point out in footnote 131 that they considered, they did look at East-West information as submitted during the preliminary investigation and found that the trends were the same, that it was not significantly different. And at the end of the day, they're still going to have to average and weight average these individual company-to-company impacts, but looking at the industry as a whole, based on what they have in front of them. As has been pointed out, what they had from, at least in the final, from the two companies that submitted, Lion and Goodyear, they had the majority of the industry in that, and also, I believe, attempted to point out that for the one company they didn't have final information from, they took a look at the same trends for that company for the preliminary, which they did have data from, and found that the trends were the same. Secondly, I think it's important the commission identified that contract pricing is partially tied to cost of raw materials, but they also identified that this fixed conversion fee is a critical component of the contract, which is not affected by raw material cost. So there's substantial evidence in the record that that critical pressure point for price competition is what is important, and there was a significant amount of information. Finally, the appellant's interpretation of record evidence in pricing competition, we believe, is not correct. They conclude that purchasers leverage suppliers off of each other, but not that suppliers use the price of subject imports. The price of subject imports is leveraged. Yet in their brief to the commission, they admitted that purchasers could manipulate all suppliers to achieve desired prices during the contract negotiation process. So it's seemingly implausible that purchasers did not use price of fungible subject imports as leverage. What other leverage would there be? That is what the commission concluded. Okay. I think you've exceeded your time. Why don't we hear back from the appellant. Thank you. Thank you, Your Honor. A couple of points, four points in rebuttal, and then I'd like to say some conclusionary remarks. As far as what the counsel for the commission stated that raw materials, other raw materials, overhead, and profit are all in the fixed fee component of a contract price, I refer you to Lyon's contract formula, and I believe we talk about that on page 31 of our confidential brief. Then also, the commission and Lyon both do not talk about any objective purchasers saying that they had to, there's no information on the record supporting that objective purchasers reduce the prices, I mean, use the low price of subject imports as leverage. They said it's an iterative process. So you get subject imports, you get the domestic high product, and you pay the two both off each other. Nowhere in the record does it say that they use subject imports as a starting point. In fact, only one in 20 purchasers reported that they had to reduce prices due to low subject imports, and that purchaser was an affiliate of a U.S. producer, and that information is on page 1589 of the appendix. Also, we talked about, the commission talked about the final three quarters, and there's no information. Number one, as I said in my argument before, you have ten quarters of East-West pricing behavior. Those last three, you can only infer that East-West continued that pricing behavior. It filed for bankruptcy at the end of the POI. As far as the pricing product that's missing from the preliminary from East-West, as we state, that product, well, I'll just leave it. It's confidential information, but that product really doesn't matter in the grand scheme of things. We've now heard from the commission and Lyon's arguments that prices of subject imports affected the price of the domestic-like product and adversely affected the condition of the domestic industry. However, those arguments do not change the facts, including the previously excluded facts or the law. Indeed, including East-West pricing behavior changes the commission's underselling analysis, rendering it unsupported by substantial evidence. The commission's underselling analysis, as admitted by the commission at the CIT, was counter to the Even if this court considers subject imports underselling to be prevalent and does not consider East-West pricing behavior, this court in all text determined that if there are no effect on prices, underselling in and of itself is not dispositive. The commission's determining price depression by truncating the last quarter of its price depression analysis via one sentence and a footnote was not in accordance with law. However, if this court were to refer to the commission's methodology and only consider part of the period, the decrease in the price of the domestic-like product exactly equaled the decrease in the cost of raw materials. In considering the argument today, I urge the court to remember three facts. First, there's no objective support in the record that U.S. prices or U.S. domestic-like product conversion fees fell to meet those of subject imports. On page 1566, objective purchasers identified East, West, and Lion as the price leaders. The conversion fees of the domestic-like product decreased on contracts with purchasers that bought no subject imports, thereby demonstrating that reductions in conversion fees were not attributable to subject imports. That's appendix page 1748 at note 37. There were simply no price effects attributable to subject imports with or without omitting the last quarter of the period of investigation and with or without including East, West pricing behavior. Finally, subject imports were not the cause of the domestic industry drills. East, West pricing behavior conducted throughout the period of investigation, its bankruptcy, and Lion's pricing behavior and Lion's cost price squeeze as detailed in our brief were, thereby rendering the commission's impact analysis unsupported by substantial evidence and otherwise not in accordance with law. Thank you very much. Thank you. We thank all parties and the case is submitted.